CLERK'S OFFICE
A TRUE COPY
Mar 28, 2025
s/ K. Reed
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of ) 
*(Briefly describe the property to be searched or identify the person by name and address)* )

One Apple iPhone, pink/purple in color, currently in law enforcement custody, as further described in Attachment A

Case No. 25 MJ 61

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Eastern _____ District of _____ Wisconsin _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & 846 | Possession with Intent to Distribute a Controlled Substance; and Conspiracy to Possess with Intent to Distribute a Controlled Substance. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

MATTHEW KILBY
Digitally signed by MATTHEW KILBY
Date: 2025.03.27 09:49:21 -05'00'

*Applicant's signature*

Matthew Kilby, DEA SA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: 03/28/2025

William E. Duffin

*Judge's signature*

William E. Duffin, U.S. Magistrate Judge

City and state: Milwaukee, Wisconsin

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Matthew Kilby, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent (SA) with the Drug Enforcement Administration (DEA).  I have been so employed since October of 2019 and am currently assigned to the DEA Milwaukee District Office. Between December of 2019 and October of 2022, I was assigned to the DEA El Paso Division Office in El Paso, Texas. Between October of 2022 and December of 2023, I was assigned to the DEA Las Cruces District Office in Las Cruces, New Mexico.  As part of my duties as a DEA Special Agent, I investigate criminal violations relating to drug trafficking and money laundering offenses, including criminal violations of federal controlled substances laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963. As a result, my investigative experience includes, but is not limited to, physical and electronic surveillance, debriefing of defendants, informants, witnesses, and others who have knowledge of the distribution, transportation, storage, and importation of controlled substances.

3.      I have participated in complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections

1

1956 and 1957, and other related offenses. More specifically, my training and experience includes the following:

a.   I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

b.   I have experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

c.   I am familiar with the appearance and street names of various drugs, including but not limited to, marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

d.   I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

e.   I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations. Drug traffickers will communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging application, and social media;

f.   I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

g.   I know that drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate drug trafficking; and

h.   I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, handbags, and jewelry. I know that drug traffickers often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement.

4.   I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the

2

use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

5. Throughout this affidavit, reference will be made to "case agents". Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is intended to show that there is probable cause for the requested warrant and does not set forth all my knowledge about this matter.

6. Based on the information described below, I believe there is probable cause that Shakla STEPHENS, John HARRIS, Corey FINCH, Robert ASKEW, and other individuals identified and not identified, have violated Title 21, United States Code, Sections 841(a)(1) (Possession with Intent to Distribute a Controlled Substance) and 846 (Conspiracy to Possess with Intent to Distribute a Controlled Substance) and that evidence of this crime can be found in the **Device** as described in Attachment A. The evidence to be seized from the **Device** is described in Attachment B.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7. The property to be searched is the cellphone seized from Shakala STEPHENS on July 13, 2024, after she was arrested by Phoenix Police Department, more fully described as the following, hereinafter referred as the "**Device**":

       i. One Apple iPhone, pink/purple in color.

3

The **Device** is currently located at the DEA Milwaukee District Office in Milwaukee, Wisconsin.

The applied-for warrant would authorize the forensic examination of the **Device** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

**A.    Background**

8.    Since December 2024, case agents have been investigating the drug trafficking activities of Corey FINCH and others.

9.    On December 17, 2024, case agents conducted an arrest warrant on Corey FINCH and multiple state search warrants in the Racine and Mount Pleasant, Wisconsin areas. As a result, FINCH, Robert ASKEW, and others were arrested. In addition, case agents seized approximately 17.98 kilograms of blue "M30" pills, which field tested positive for fentanyl, three handguns, and a Central Machinery Shop Press used for pressing cocaine, from FINCH's and ASKEW's residences.

10.    On the same date, during a post-Miranda, recorded interview at the Racine Police Department, FINCH admitted that he had purchased the above suspected fentanyl pills in Arizona and had transported them back to his residence for the purpose of selling them. FINCH stated that whenever he traveled to Arizona to acquire pills, he would either drive a rental car both ways or he would fly to Arizona and drive a rental car back to Wisconsin.

11.    During the above search and arrest warrants, cellular telephones were seized by case agents from both FINCH (one cellphone) and ASKEW (two cellphones).

12.     On January 7, 2025, a state of Wisconsin search warrant was approved for the contents of FINCH's cellular telephone by the Honorable Danielle Shelton. As a result, case agents began analyzing the contents of FINCH's telephone.

13.     Upon reviewing the data that was downloaded from FINCH's telephone, case agents observed that telephone number 404-992-5781 was listed as one of the assigned telephone numbers for FINCH's telephone. At that time, case agents queried telephone number 404-992-5781 through law enforcement databases. As a result, case agents received information from the Phoenix Police Department (PPD) Commercial Narcotic Interdiction Unit. At that time, PPD personnel advised that telephone number 404-992-5781 was connected to an individual who was a suspected conspirator regarding the seizure of approximately 916.5 grams of fentanyl pills by PPD personnel on July 13, 2024, at the Phoenix Sky Harbor Airport, in Phoenix, Arizona.

**B.      Phoenix Fentanyl Seizure**

14.     According to PPD reports on July 13, 2024, Transportation Security Administration (TSA) personnel working at Phoenix Sky Harbor International Airport, inside terminal three, had observed an anomaly at the passenger security check point x-ray, inside a carry-on suitcase possessed by/belonging to STEPHENS and HARRIS. During the secondary screening, TSA personnel opened the suitcase (described as a black, soft-shelled, zippered roller with a pull-up handle) and observed a large amount of "blue m30 pills", suspected of being fentanyl (Figure 1), and notified uniformed officers. The carry-on suitcase with the fentanyl package contained both men's and women's clothing. Specifically, two pairs of men's shoes (size 9.5/10) as well as multiple men's shirts, socks and belt. Additionally, it contained women's body suits, bras, underwear, and a tank top.

5



(Figure 1)

15.     TSA reported to the responding officers that both STEPHENS and HARRIS abandoned the suitcase and continued up the escalators toward the exit and gate concourses. Officers took possession of the suitcase and suspected drug package and were able to locate and detain STEPHENS. HARRIS was not physically located by officers. Officers advised that HARRIS and STEPHENS were traveling together and were seen on airport surveillance footage entering the security check point passenger lanes. HARRIS was observed pulling the suitcase while waiting in line and placed it onto the belt for screening while STEPHENS placed her handbag onto the belt. Both STEPHENS and HARRIS physically cleared the screening and were both waiting on the other side of the x-ray machine for the suitcase. However, when the suitcase was flagged and pulled aside for secondary screening, HARRIS immediately left STEPHENS in line to wait for the bag. Airport surveillance footage showed HARRIS take the escalator up to the gate concourse area where he exited the secured area and took an elevator to ground level. HARRIS is then seen on surveillance outside the building waiting curbside and eventually entered a black passenger car and left STEPHENS behind at the airport.

6

16.     STEPHENS was observed abandoning the suitcase at the TSA checkpoint but was seen coming back twice to try and retrieve it. At one point, STEPHENS was observed entering the secured side of the secondary screening area which is only authorized for TSA personnel. At that time, STEPHENS was observed grabbing the suitcase to take it but was confronted by TSA personnel and was told she was not allowed to take the bag. STEPHENS then abandoned the bag again. STEPHENS was located at the departure gate for her flight and was detained there.

17.     While officers walked with STEPHENS to the police office, STEPHENS initially stated that she was by herself and did not have any more bags. At that time, STEPHENS tried to conceal some paperwork within the shorts she was wearing. The paperwork was discovered to be two Delta Airlines boarding passes issued to herself and HARRIS for flight #DL1070 from Phoenix to Detroit where they were to board their connecting flight to Milwaukee.

18.     When detained by officers, STEPHENS had the following items belonging to HARRIS:

    a. HARRIS's Delta Airlines boarding pass from Phoenix, Arizona to Detroit, Michigan to Milwaukee, Wisconsin (inside the shorts she was wearing);
    b. HARRIS's recently issued social security card, dated April 11, 2024, listing his full name "John L. Harris Jr." SSN# XXX-XX-X962 (inside her wallet with her children's social security cards); and
    c. HARRIS's Wisconsin Department of Corrections "travel permit" for the specific dates of March 14, 2024 to March 18, 2024, listing his full name "John L. Harris", DOB:XX/XX/1991, DOC#XXX110. This permit was issued on March 11, 2024, and signed by his probation officer D. Patera.

19.     PPD reports indicated that HARRIS and STEPHENS arrived in Phoenix together on July 11, 2024, at 1:12 PM via Delta flights #DL2192 (Milwaukee to Detroit) connection on #DL1135 (Detroit to Phoenix). They attempted to leave together from Phoenix on July 13, 2024, at 11:00 AM via Delta Airlines flights #DLl1070 (Phoenix to Detroit) with a connection on #DL3971 (Detroit to Milwaukee).

7

20.     STEPHENS was read her constitutional rights and conducted a brief interview during which she stated that she was traveling alone and did not have a bag, only a purse. STEPHENS then admitted that she was traveling with a male companion, known only as "Steve". When asked why she attempted to take the black roller bag out of the TSA screening area, STEPHENS stated that she thought it was her bag, contradicting her previous statements. When asked where her bag was, STEPHENS stated that she said she did not know but the bag seized by PPD was not hers and she did not know what was in it.

21.     On the same date, STEPHENS was reminded of her constitutional rights and waived them again prior to being interviewed by a PPD detective. STEPHENS then provided the following information, she initially stated that she was traveling with HARRIS, but then quickly said she was not. STEPHENS also confirmed her residence/mailing address in Racine, Wisconsin prior to requesting that the interview be terminated. During the interview, PPD personnel located the **Device** in STEPHENS's possessions and seized the **Device** after STEPHENS triggered the system lockout from too many incorrect password entries.

22.     In STEPHENS's purse, PPD personnel also discovered a receipt from Milwaukee Airport "Smart Park" parking structure dated July 11, 2024, at 11:45 AM. STEPHENS stated that her personal vehicle, bearing license plates ATX-5227, was parked at the airport in Milwaukee. PPD also discovered a receipt from a Target store located in Goodyear, Arizona dated July 11, 2024. According to the receipt, STEPHENS purchased several health/beauty items and two items of apparel. The apparel was listed on the receipt as two "Wild Fable". When STEPHENS was detained, she was wearing a lime green "Wild Fable" tank top.  Inside the carry-on suitcase that contained the fentanyl, PPD discovered a yellow "Wild Fable" tank top. According to PPD personnel, STEPHENS did not arrive at the airport wearing the above green tank top.  Based on

8

this, case agents believe STEPHENS changed outfits after the black roller bag was selected for inspection, but prior to her arrest.

23.    The pills and packaging were later separated and tested by the PPD Drug Laboratory, and a representative sample was tested and confirmed to be fentanyl. The total table weight was 851.0 grams +/- 2.6 grams.

24.    As PPD personnel investigated HARRIS and STEPHENS for the numerous fentanyl pills seized on July 13, 2024, PPD personnel learned that from Delta Airlines records, FINCH had purchased one-way tickets for himself and HARRIS to fly from Milwaukee, Wisconsin to Phoenix, Arizona on June 14, 2024.

### C.    Communication on FINCH's Telephone

25.    On January 7, 2025, case agents began examining FINCH's telephone for conversations between FINCH and HARRIS. As a result, case agents identified three conversations between HARRIS and FINCH, two of which occurred via Facebook and one of which occurred between FINCH's telephone number 404-992-5781 and telephone number 262-664-3687, which case agents believe belong to HARRIS. Case agent reviewed a law enforcement database which indicated telephone number 262-664-3687 has been used by HARRIS. The law enforcement database also indicated HARRIS is connected to addresses in Milwaukee and Racine, Wisconsin.

26.    Case agents are aware that FINCH's Facebook name is "Stoney Otw" and "Stoney" is a nickname frequently utilized by FINCH. Case agents also identified the profile "Bossman Slug" as the profile utilized by HARRIS. According to Wisconsin Department of Corrections records, HARRIS has a tattoo on his arm that reads "Lil Slug". Additionally, case agents were able to match photos from the profile "Bossman Slug" to booking photos of HARRIS. According to

publicly available Cash App data, the telephone number 262-664-3687 is linked to an account using profile name "Sack Chasing Slug" and username "$RackChasingSlug".

27.     Upon examining the publicly accessible information on the profile "Bossman Slug", case agents observed a post from January 6, 2025. The post states that "Bossman Slug" is with Shakla Green. The post reads "Happy Bday to da queen I Luv u. Enjoy yo day if I was home it would have been more bags dis yr [emoji]Got u for life" and displays a video of HARRIS purchasing multiple shopping bags worth of items from Echelon Gallery which is located at 3801 Monarch Drive, Racine, Wisconsin. The post also includes a photo of STEPHENS next to the video. Upon examination of the profile Shakla Green, case agents observed that the URL for the profile is https://www.facebook.com/shakla.stephens, photos on the profile match photos of STEPHENS taken by PPD on July 13, 2024, and that the profile lists Shakla Green as the CEO of KJ Cleaning Services, LLC, a cleaning company that PPD identified STEPHENS being affiliated with in Racine, Wisconsin. As a result, case agents believe that STEPHENS and HARRIS share a personal, romantic relationship with each other.

28.     In total, the three conversations between FINCH and HARRIS took place between April 11, 2024, and August 6, 2024. The following paragraphs contain a summary of the conversations between FINCH and HARRIS that case agents believe are valuable to this investigation and are not intended to be a verbatim account of all the messages between FINCH and HARRIS. For greater detail, reference can be made to the telephone extraction data held in Racine Police Department evidence.

29.     On May 5, 2024, HARRIS, via Facebook, messaged FINCH stating "Yoo need 100". Based on training and experience, case agents believe that this message refers to HARRIS wanting to purchase drugs, possibly 100 fentanyl pills, from FINCH.

30.     On June 13, 2024 (the day before FINCH's and HARRIS's flight to Phoenix), FINCH, via Facebook, messaged HARRIS stating "5:28 so mf gotta get there at like 4:45 I went out Milwaukee". Later that day, FINCH sent HARRIS another message via Facebook stating, "U gone have mf to take us to the airport". These messages led case agents to believe that FINCH and HARRIS were coordinating their transportation to the airport for their flight on June 14, 2024.

31.     On June 16, 2024, FINCH, via Facebook, messaged HARRIS stating, "My other people's funna hit me when he leave from with his daughter but then mfs a lil more how u wanna play it". Later that day, HARRIS, via Facebook, responded by stating "How much more". FINCH, via Facebook, responded "They 30". FINCH then sent a follow-up message stating, "But bro was finna throw sum on me too I damn near wanna see if he gone get em fr cause dude telling him don't spend the pape". HARRIS then responded, "We gone fuck you mean" and "Pape on the line we gone make that shit anyways n come rb". FINCH responded with "Bet". HARRIS then responded with "Nbs we chasing that shif ain't time to b waiting around when it's thousands ona floor". Based on training and experience and the information in this conversation and the fentanyl pills seized in July 2024 and December 2024, case agents believe that, on June 16, 2024, HARRIS and FINCH were discussing whether or not they wanted to purchase fentanyl pills from FINCH's supplier for $0.30 per pill with the hope that the supplier would also add on more pills for FINCH.

32.     In the text message conversation between telephone number 404-992-5781 (FINCH) and telephone number 262-664-3687 (HARRIS), on June 3, 2024, HARRIS messaged FINCH stating "Yoo lil bro need them again 200 this time he said" and "Need kpack wtw". During his post-arrest interview, FINCH advised case agents that FINCH and his conspirators refer to packages of 1,000 fentanyl pills as "kpacks", therefore, case agents believe that these messages refer to HARRIS acquiring 1,200 fentanyl pills from FINCH.

33.     During the analysis of the data from FINCH's telephone, case agents also observed a conversation between telephone number 404-992-5781 (FINCH) and an individual that case agents have identified as Kendell DAYS using telephone number 414-387-3155. Case agents believe telephone number 414-387-3155 is DAYS because the telephone number is saved in FINCH's contacts list as "KD". Further, during their text conversation with each other, DAYS instructs FINCH to make sure that his name is spelled correctly for a Walmart-to-Walmart money transfer and spells out the name "Kendell Days". Additionally, according to publicly available Cash App data, 414-387-3155 is linked to a profile with the profile name "Kendell Days" and the username "$Dizzle016".

34.     Based on the contents of the messages between FINCH and DAYS, including photos of large quantities of blue pills that appear consistent with fentanyl pills, case agents believe that DAYS is a source of supply of fentanyl pills for FINCH in Arizona. During their conversation with each other, case agents observed that FINCH and DAYS mentioned "Slug" multiple times, including while HARRIS and FINCH were in Arizona in June 2024. The following paragraphs contain a summary of the conversations between telephone number 404-992-5781 (FINCH) and telephone number 414-387-3155 (DAYS) that case agents believe are valuable to this investigation and are not intended to be a verbatim account of all the messages between DAYS and FINCH.

35.     On June 10, 2024 (four days before FINCH and HARRIS flew to Arizona), DAYS messaged FINCH stating "Lmk gang I gotta get myself together….lmk how many too so I can let my ppl kno so wen u touch we not waiting for em". FINCH responded by saying "IK mf a go for 25". DAYS responded, "Bet that's sweet". FINCH responded with "I'm asking you will yo peoples". Based on training, experience and the investigation into the DTO, case agents believe that these messages are consistent with FINCH and DAYS discussing how many pills FINCH will

12

want to buy when he arrives in Arizona so that DAYS can order them, so they don't have to wait around. Case agents also believe that in these messages FINCH stated that he would be willing to purchase pills for $0.25 per pill and was wondering if DAYS's supplier could sell pills at that price because FINCH stated it was "a go" for 25, as in good to go and because FINCH's next message asks DAYS if DAYS's "peoples" would agree to "25". Additionally, during his post-arrest interview in December 2024, FINCH advised case agents that he was able to acquire fentanyl pills in Arizona for prices close to $0.25 per pill.

36.     On June 16, 2024, DAYS texted FINCH stating "I hadda run by my og shit but I have the slug the key just make sure yall lock up n everything off if u dip u know u good in my shii gang". Based on training, experience, and the investigation into the DTO, case agents believe that, in this message, DAYS told FINCH that he had to leave, but that he gave HARRIS the key to DAYS's residence. DAYS then instructs FINCH to lock up and turn everything off if he and HARRIS were to leave.

37.     On July 15, 2024 (two days after STEPHENS and HARRIS attempted to bring 916.5 grams of fentanyl through the Phoenix airport), DAYS texted FINCH stating "The nigga slug got 11 thousand caught up…. I gotta wait n see how many left now cuz I already went from 25 thousand to 15". FINCH responded with "How he do that". DAYS responded, "He split em in half n had somebody else fly the other". FINCH responded by stating "Man idk why you had him do ts he ain't even gang fr" and "I jus had him to drive bro". Based on the investigation, training and experience, case agents believe that, in these messages, FINCH and DAYS were discussing the seizure of 916.5 grams of fentanyl pills from HARRIS and STEPHENS at the Phoenix airport. Additionally, case agents believe that FINCH tells DAYS that HARRIS can't be trusted to transport pills, FINCH only brought HARRIS to Arizona to help him drive pills back to Wisconsin.

38.     Based on the above, case agents believe that HARRIS, STEPHENS, FINCH, and DAYS are members of the same drug trafficking organization that took fentanyl pills supplied by DAYS and transported or attempted to transport them to the Milwaukee and Racine, Wisconsin areas where FINCH and HARRIS sell them in smaller quantities. Case agents also suspect that, based on the above, the pills seized on July 13, 2024, were supplied by DAYS to STEPHENS and HARRIS.

**D.     The Device**

39.     On March 25, 2025, case agents received the **Device** from PPD personnel. After it was seized from STEPHENS on July 13, 2024, the **Device** was stored as PPD evidence until it was removed by PPD Detective Elizabeth Poole March 19, 2025. On March 20, 2025, the **Device** was shipped to your affiant via FedEx tracking number 772859836108 and is in the same or similar condition as when it was seized from STEPHENS.

40.     The **Device** is currently in the lawful possession of the DEA Milwaukee District Office in Milwaukee, Wisconsin. In my training and experience, I know that the **Device** has been stored in a way that its contents are, to the extent material to this investigation, in substantially the same state as they were when the **Device** first came into the possession of Milwaukee DEA.

41.     Based on the conversations between FINCH and DAYS and FINCH and HARRIS, whom case agents believe STEPHENS has a close, romantic relationship with, case agents believe that STEPHENS used the **Device** to facilitate drug trafficking activities on and before July 13, 2024, in coordination with HARRIS and DAYS and evidence of drug trafficking may likely be stored and recorded on the **Device**.

42.     Through the affiant's training, experience, and discussions with other experienced law enforcement officers, the affiant is familiar with the ways in which drug traffickers conduct

their unlawful trade, including their methods of distribution, their use of communication devices, their use of coded communications to conduct their transactions, the employment of counter surveillance, their use of false or fictitious identities, and their use of various forms of electronic devices to store and/or conceal illegal activity.

43.     Based upon my training and experience, the affiant knows that individuals involved in drug trafficking frequently use cellular telephones to maintain contact and arrange transactions with their sources, customers, and co-conspirators in the distribution of controlled substances. The affiant has also found it very common for crime suspects to use their cellular telephones to communicate orally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs.

44.     Based on my training and experience, the affiant is aware that individuals involved in the trafficking of controlled substances often possess multiple cellular devices to compartmentalize their illegal activity and to avoid law enforcement detection.

45.     Based upon my training and experience, the affiant believes it is common for suspects who possess illegal controlled substances to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the illegal controlled substances and proceeds of drug trafficking. Furthermore, the affiant believes it is common for these photographs and visual depictions to be kept and maintained on their cellular devices.

## TECHNICAL TERMS

46.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.   Cellular telephone: A cellular telephone is a handheld wireless device used for voice and data communication through radio signals. These telephones send

15

signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system (GPS) technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital

16

data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (GPS) consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually

17

include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system (GPS) technology for determining the location of the device.

f.  Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h.  IP Address: An Internet Protocol address (IP address) is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer

18

attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

47. Based on my training, experience, and research, I know that the **Device** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA, and all can access the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

48. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some time on the device. This information can sometimes be recovered with forensics tools.

49. As explained below, information stored within a cellular phone (cell phone) may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the

19

information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner. Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (e.g., location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Last, stored electronic data may provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation. For example, information in the cell phone may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cell phone itself or by a program that deletes or over-writes the data contained within the cell phone, such data will remain stored within the cell phone indefinitely.

50. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device

20

was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

21

51.    *Manner of execution*.  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

<u>**CONCLUSION**</u>

52.    Based on the above information provided in this affidavit, I believe there is probable cause that the **Device** possessed by STEPHENS when she was arrested on July 13, 2024, contains evidence of violations of Title 21, United States Code, Sections 841(a)(1) (Possession with Intent to Distribute a Controlled Substance) and 846 (Conspiracy to Possess with Intent to Distribute a Controlled Substance), involving Shakla STEPHENS, John HARRIS, Corey FINCH, Robert ASKEW, and other individuals identified and not identified.

**ATTACHMENT A**

**Property to be Search**

The property to be searched is the cellphone seized from Shakala STEPHENS on July 13, 2024, after she was arrested by Phoenix Police Department, more fully described as the following, hereinafter referred as the "**Device**":

       i.   One Apple iPhone, pink/purple in color.

The **Device** is currently located at the DEA Milwaukee District Office in Milwaukee, Wisconsin.

The applied-for warrant would authorize the forensic examination of the **Device** for the purpose of identifying electronically stored data particularly described in Attachment B.

## ATTACHMENT B

### Particular Things to be Seized

All records on the **Device** described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) (Possession with Intent to Distribute a Controlled Substance) and 846 (Conspiracy to Possess with Intent to Distribute a Controlled Substance) involving Shakla STEPHENS, John HARRIS, Corey FINCH, Robert ASKEW, and other individuals identified and not identified, including:

a. Preparatory steps taken in furtherance of this crime;
b. Any audio, video, and/or photograph(s) files on the phone of the above criminal activity or of evidentiary value;
c. All voicemail and call records;
d. All text messages and call history;
e. Contact list, to include names, addresses, phone numbers, and/or email addresses;
f. All social media sites used and applications for social media sites;
g. Lists of customers and related identifying information;
h. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;
i. Types, quantities, and prices of firearms possessed;
j. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);
k. Travel information, including rental cars, airline, or other transport information;
l. All bank records, checks, credit card bills, account information, and other financial records;
m. All internet activity; and
n. All location data including from the phone and/or from any downloaded applications.

Evidence of user attribution showing who used or owned the **Device** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

Records evidencing the use of the Internet Protocol address to communicate with using the internet including:

a. records of Internet Protocol addresses used; and

24

b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data), any photographic form, and/or any memory card or other data storage device within or connected to the **Device**.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

❏ Original

CLERK'S OFFICE
A TRUE COPY
Mar 28, 2025
s/ K. Reed
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   25   MJ   61 |
| One Apple iPhone, pink/purple in color, currently in law enforcement custody, as further described in Attachment A | ) ) ) ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before ___04/11/2025___ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. William E. Duffin_____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial) and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:      ___03/28/2025 at 9:45 a.m.___          *William E. Duffin*
                                                                                            *Judge's signature*

City and state:  ___Milwaukee, WI___          Honorable William E. Duffin, U.S. Magistrate Judge
                                                                          *Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**

**Property to be Search**

The property to be searched is the cellphone seized from Shakala STEPHENS on July 13, 2024, after she was arrested by Phoenix Police Department, more fully described as the following, hereinafter referred as the "**Device**":

         i.   One Apple iPhone, pink/purple in color.

The **Device** is currently located at the DEA Milwaukee District Office in Milwaukee, Wisconsin.

The applied-for warrant would authorize the forensic examination of the **Device** for the purpose of identifying electronically stored data particularly described in Attachment B.

1

**ATTACHMENT B**

**Particular Things to be Seized**

All records on the **Device** described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) (Possession with Intent to Distribute a Controlled Substance) and 846 (Conspiracy to Possess with Intent to Distribute a Controlled Substance) involving Shakla STEPHENS, John HARRIS, Corey FINCH, Robert ASKEW, and other individuals identified and not identified, including:

a. Preparatory steps taken in furtherance of this crime;
b. Any audio, video, and/or photograph(s) files on the phone of the above criminal activity or of evidentiary value;
c. All voicemail and call records;
d. All text messages and call history;
e. Contact list, to include names, addresses, phone numbers, and/or email addresses;
f. All social media sites used and applications for social media sites;
g. Lists of customers and related identifying information;
h. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;
i. Types, quantities, and prices of firearms possessed;
j. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);
k. Travel information, including rental cars, airline, or other transport information;
l. All bank records, checks, credit card bills, account information, and other financial records;
m. All internet activity; and
n. All location data including from the phone and/or from any downloaded applications.

Evidence of user attribution showing who used or owned the **Device** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

Records evidencing the use of the Internet Protocol address to communicate with using the internet including:

a. records of Internet Protocol addresses used; and

2

b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data), any photographic form, and/or any memory card or other data storage device within or connected to the **Device**.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

3